UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

U.S. SECURITIES AND EXCHANGE COMMISSION :
100 F Street, N.E. :
Washington, D.C. 20549, :
                    **Plaintiff,** :

               v. :   Civil Action No.

ABB LTD, :
Affolternstrasse 44 :
Zurich, Switzerland CH-8050, :

                    **Defendant.** :

---

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

### SUMMARY

1.  This action involves violations of the anti-bribery, books and records, and internal controls provisions of the federal securities laws arising from bribery and kickback schemes at subsidiaries of ABB Ltd ("ABB"). ABB, a Swiss corporation, is a global provider of power and automation products and services. From 1999 to 2004, ABB, through a U.S. subsidiary and six foreign-based subsidiaries, offered and paid bribes to government officials in Mexico to obtain and retain business with government owned power companies, and paid kickbacks to Iraq to obtain contracts under the United Nations Oil for Food Program (the "Program"). In all, ABB's subsidiaries made at least

$2.7 million in illicit payments in these schemes to obtain contracts that generated more than $100 million in revenues for ABB.

2. ABB, through a U.S. subsidiary, violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78dd-1] by offering and paying bribes to Mexican government officials to obtain and retain business. ABB violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by improperly recording these and other illicit payments as legitimate business expenses in its books and records. ABB violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to devise and maintain internal controls sufficient to detect and prevent these illicit payments.

**JURISDICTION**

3. This court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78o(e), and 78aa]. ABB, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

**VENUE**

4. Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. ABB does business in this judicial district and certain acts or transactions constituting the violations by ABB occurred in this district.

**DEFENDANT**

5. **ABB Ltd** is a Swiss corporation headquartered in Zurich, Switzerland. ABB is a global provider of power and automation products and services that operates

through hundreds of subsidiaries worldwide. ABB's American Depository Shares have been registered with the Commission pursuant to Exchange Act Section 12(b) [15 U.S.C. § 78l(b)] since April 4, 2001, and trade on the New York Stock Exchange under the symbol "ABB."[1]

### RELEVANT ENTITIES

6.  **ABB Inc.** is a wholly owned U.S. subsidiary of ABB Ltd that is incorporated in Delaware.

7.  **ABB Network Management ("ABB NM")** is a Sugar Land, Texas based business unit of ABB Inc. ABB NM provides products and services to electric utilities for managing power generation and transmission networks.

8.  **ABB Near East Trading Ltd** is a 95% owned subsidiary of ABB Ltd Jordan ("ABB Jordan"), which is a wholly owned subsidiary of ABB Ltd.

9.  **ABB Automation, ABB Industrie AC Machines, and ABB Solyvent-Ventec** (collectively referred to as "ABB France"), are each wholly owned French subsidiaries of ABB Ltd. ABB Ltd sold ABB Solyvent-Ventec effective January 31, 2002.

10. **ABB AG Vienna Austria** ("ABB Austria") is a wholly owned subsidiary of ABB Ltd.

11. **ABB Elektrik Sanayi AS** ("ABB Turkey") is a wholly owned subsidiary of ABB Ltd.

---

[1] In 2004, in a settled action the Commission filed against ABB, the Court, in addition to other relief ordered, enjoined ABB from violating the anti-bribery, internal controls, and books and records provisions of the Exchange Act. *SEC v. ABB Ltd*, No. 1:04CV01141 (D.D.C. November 30, 2004) (RBW). The violations alleged in that action involved four ABB subsidiaries located in the U.S. and abroad that, from 1998 to 2003, made over $1.1 million in illicit payments to obtain business in Nigeria, Angola, and Kazakhstan. The violations alleged in this Complaint were not the subject of that prior action.

# FACTS

## I. The Mexican Bribery Scheme

12. ABB Network Management ("ABB NM") is a Sugar Land, Texas based business unit of ABB Inc., a U.S. subsidiary of ABB Ltd, which provides products and services to electric utilities for managing power generation and transmission networks. ABB acquired ABB NM, formerly known as Bailey Network Management, in its corporate acquisition of Elsag Bailey Process Automation N.V., in early 1999. Between 1997 and 2004, ABB NM and its corporate predecessor, paid over $1.9 million in bribes to government officials and others in Mexico to obtain and retain business with two government owned electric utilities, Comision Federal de Electricidad ("CFE") and Luz y Fuerza del Centro ("LyFZ"). The bribes were funneled through Mexican Company X, ABB NM's agent in Mexico, and two other companies in Mexico, Intermediary Company S and Intermediary Company O. ABB, which failed to conduct any due diligence on the use or payments to this agent and other companies, improperly recorded the illicit payments on its books as payments for commissions and services on the projects. As a result of this scheme, ABB NM was awarded contracts with CFE and LyFZ that generated over $90 million in revenues and $13 million in profits for ABB.

13. CFE is a utility owned by the government of Mexico that supplies electricity to over 26 million customers in Mexico. The offer and payment of bribes to government officials at CFE dates back to at least 1997, prior to acquisition by ABB, and involved a project called SITRACEN. The SITRACEN contract involved a comprehensive upgrade of networking systems at CFE's national control center, the

emergency backup control center, eight area control centers, and eight subarea control centers. At the time ABB NM's predecessor was bidding on this contract, it agreed to pay bribes to CFE officials to obtain the contract. CFE awarded the contract to ABB NM's predecessor in December 1997. The project lasted through 2001 and generated more than $40 million in revenues for ABB.

14. From 1997 through 2001, ABB NM (and its predecessor) made at least $913,876.70 in illicit payments in connection with the SITRACEN project. The bribes were paid through Mexican Company X and Intermediary Company S, and falsely recorded in ABB's books as payments for commissions and local services. ABB NM paid at least $108,000 to CFE officials or their designees through Mexican Company X, and paid at least another $805,876 to CFE officials or their designees through Intermediary Company S.

15. In 2003, ABB NM agreed to pay over $5 million in bribes to CFE officials to obtain a contract with CFE for another large project called EVERGREEN. EVERGREEN was a contract to maintain and upgrade CFE's networking systems. ABB NM agreed to pay the bribes to CFE officials over the course of the contract through phony invoices submitted by Mexican Company X, Intermediary Company S and Intermediary Company O.

16. ABB Inc. had to obtain approval from ABB to execute the EVERGREEN contract due to the contract's size and certain contractual terms. During that approval process, ABB failed to conduct any due diligence on the use or payment terms with the local agent, Mexican Company X, or other companies to be used in connection with the project.

17. In October 2003, CFE awarded ABB NM the EVERGREEN contract. The project lasted through 2007, and ultimately generated approximately $37 million in revenues for ABB. As part of the bribery scheme, ABB NM also was awarded other smaller contracts with CFE and another government owned utility, LyFZ.

18. In 2003 and 2004, ABB NM paid at least $984,078 in bribes to CFE officials or their designees in connection with the EVERGREEN project. The bribes were paid through Mexican Company X, Intermediary Company S, and Intermediary Company O, which submitted invoices to ABB NM for phony local services. Despite the amount and volume of the payments, and the fact that certain of the payments were made not to the companies submitting invoices but to the personal bank accounts of individuals, ABB failed to conduct any review of these payments.

## Examples of the Illicit Payments

19. ABB NM funneled bribery payments to CFE officials through its agent in Mexico, Mexican Company X. With the SITRACEN project, ABB NM funneled the bribes through Mexican Company X as purported commission payments. With the EVERGREEN contract, ABB NM funneled the bribes through Mexican Company X as purported payments for local services, for which Mexican Company X submitted phony invoices to ABB NM. At times, principals of Mexican Company X paid cash bribes directly to CFE officials and at other times wrote checks or wired money to individuals or accounts designated by the CFE officials. The following are examples of the illicit payments:

20. As part of the bribery scheme, in 2000, a principal of Mexican Company X issued twelve $9,000 checks from a U.S. bank account to the daughter of a CFE

6

official. The checks were deposited into an account in her name at a financial institution in the U.S.

21. As part of the bribery scheme, in 2004, principals of Mexican Company X, in a series of transactions, wired from their U.S. bank account $197,581 to a U.S. brokerage account designated by a CFE official. At least $99,912 of this money was subsequently wired from this U.S. brokerage account to a U.S. bank account in the name of a daughter and son-in-law of a CFE official.

22. As part of the bribery scheme, in 2004, a principal of Mexican Company X, through a series of transactions, withdrew approximately $27,000 in cash from his personal bank accounts, and paid approximately $20,000 of this cash to a CFE official in Houston, Texas.

23. As part of the bribery scheme, in 2004, Mexican Company X submitted a $25,000 invoice to ABB NM for purported local services, which ABB NM paid. This invoice was fraudulent as Mexican Company X had provided no such services. The invoice was submitted at the direction of ABB NM in order to pay for a Mediterranean cruise vacation for two CFE officials and their wives.

24. As part of the bribery scheme, in 2004, Mexican Company X submitted a $10,000 invoice to ABB NM for purported local services, which ABB NM paid. This invoice was fraudulent as Mexican Company X had provided no such services. The invoice was submitted at the direction of ABB NM in order to reimburse Mexican Company X for a cash bribe paid to a CFE official.

25. Additionally, as part of the bribery scheme, from 1998 through 2004, ABB NM paid Intermediary Company S at least $1,074,676 in connection with the

SITRACEN and EVERGREEN projects, and in 2004, paid Intermediary Company O at least $403,200 in connection with the EVERGREEN project. These two entities submitted phony invoices to ABB NM, through Mexican Company X, for purported services rendered. These entities provided no legitimate services to ABB NM. These payments were part of the scheme to funnel bribes to CFE officials.

26. For example, in March 2004, Mexican Company X received invoices from Intermediary Company S and Intermediary Company O for $218,000 and $327,000, respectively. Mexican Company X forwarded these invoices, with payment instructions, to ABB NM. ABB NM paid the invoices by wiring funds to Intermediary Company S's bank account in Germany, and to Intermediary Company O's bank account in Mexico. Shortly thereafter, Intermediary Company S wired $29,539 from its account in Germany to a U.S. bank account of a private military school in Wisconsin, to pay tuition for the son of a CFE official, and wired an additional $10,018 directly to a U.S. bank account of another CFE official.

### Kickbacks To The Former General Manager of ABB NM

27. In connection with the bribery scheme in Mexico, the principals of Mexican Company X paid more than $100,000 in kickbacks to the former general manager of ABB NM. Some of the kickbacks were in cash, while others were paid by check. During the period 2002 through 2004 alone, the principals of Mexican Company X delivered to the former ABB NM general manager at least 24 checks totaling $108,942. At the general manager's direction, the payees on these checks included the general manager, his family and friends, and his credit card company.

## II.     The Embezzlement Scheme at ABB NM

28.     Between 2002 and 2004, the former general manager of ABB NM and Ali Hozhabri, a former project manager for ABB NM, embezzled $468,714 from the company. They carried out the scheme by requesting and authorizing cash and check disbursements to pay fictional expenses on contracts ABB NM had with Itaipu Binancional ("ITAIPU"), an entity owned by the governments of Brazil and Paraguay that operates a hydroelectric dam, and with Abu Dhabi Company for Onshore Oil Operations ("ADCO"), a division of a government owned company that provides electrical power in the United Arab Emirates.

### The ITAIPU Contract

29.     In 2000, as a result of a corporate acquisition by ABB, ABB NM assumed performance of a $6.9 million contract to provide products and services to ITAIPU. Between 2002 and 2004, the former general manager of ABB NM and Hozhabri embezzled nearly $330,000 in connection with the ITAIPU contract.

30.     Under that contract, ABB NM was permitted to adjust previously submitted invoices to ITAIPU to account for inflation according to a formula specified in the contract. At the general manager's direction, Hozhabri, the project manager on the contract, prepared and submitted to ITAIPU approximately $330,000 in "readjustment" invoices. When ITAIPU paid ABB NM on these invoices, Hozhabri then submitted fraudulent requests to ABB NM for disbursements to pay fictitious expenses associated with the ITAIPU contract. The disbursement requests identified the expenses as "commissions" or "local works." The general manager then authorized ABB NM's controller to approve these disbursements so that Hozhabri could take cash to Brazil to

9

pay these purported local expenses. The money was not used to pay local expenses in Brazil, but instead was split between the general manager and Hozhabri and kept for their personal use.

### The ADCO Contract

31. In 2000, as a result of the same corporate acquisition by ABB, ABB NM assumed performance of a $5.9 million contract to provide products and services to ADCO. Hozhabri also was the ABB NM project manager on this contract. In 2002 and 2003, ABB NM's former general manager and Hozhabri embezzled approximately $145,800 in connection with this contract.

32. The ADCO contract had various change orders through which ABB NM provided additional products and services to ADCO. ABB NM, through an ABB subsidiary in Abu Dhabi, submitted invoices to ADCO for these change orders. When ADCO paid certain of these invoices, Hozhabri, at the general manager's direction, submitted fraudulent requests to ABB NM for cash and checks to pay phony "subcontractor fees" in connection with those change orders. The ABB NM general manager then authorized the ABB NM controller to approve these disbursements so that Hozhabri could take cash to Abu Dhabi to pay these purported subcontractor fees. The money was not used to pay local subcontractors in Abu Dhabi, but instead was split between Hozhabri and the general manager and kept for their personal use.

### III. The Oil for Food Scheme

#### A. Background on the United Nations Oil for Food Program

33. The Oil for Food Program was intended to provide humanitarian relief for the Iraqi population, which faced severe hardship under the international trade sanctions that followed Iraq's 1990 invasion of Kuwait. The Program permitted the Iraqi government to sell its crude oil and use the proceeds to purchase food, medicine, and critical infrastructure supplies.

34. The proceeds of the oil sales were transferred directly from the buyers to an escrow account (the "U.N. Escrow Account") maintained in New York by the United Nations 661 Committee. Funds in the U.N. Escrow Account were available for the purchase of humanitarian supplies, subject to U.N. approval and supervision. The intent of this structure was to prevent the proceeds of Iraq's crude oil sales from undermining the sanctions regime by supplying cash to Saddam Hussein.

35. Corruption was rampant within the Program. By mid-2000, Iraqi ministries, on the instruction of top government officials, instituted a policy requiring suppliers of humanitarian goods to pay a ten percent kickback on each contract. This kickback requirement was euphemistically referred to as an "after sales service fee" ("ASSF"); however, no services were provided. Suppliers competing to obtain contracts under the Program were encouraged to include a ten percent markup in their bids or purchase orders.

36. The inflated contract prices were incorporated into the Oil for Food contracts as a way to permit the suppliers to recover from the U.N. Escrow Account the kickback payments they had paid secretly to Iraq. Following the 2004 release of a report

11

by the U.S. General Accounting Office exposing some of the abuses, the U.N. commissioned an independent inquiry committee, headed by former Federal Reserve Chairman Paul Volcker (the "Volcker Committee"), to investigate the Program's performance. That committee's October 27, 2005, final report estimated that the Iraqi government had diverted $1.7 billion in illicit income from the Program.

### B. ABB's Involvement in the Oil for Food Program

37. From approximately 2000 to 2004, ABB participated in the Oil for Food Program through six of its subsidiaries: ABB Ltd Jordan ("ABB Jordan"), ABB Automation, ABB Industrie AC Machines and ABB Solyvent-Ventec (collectively referred to as "ABB France"), ABB AG ("ABB Austria") and ABB Elektrik Sanayi AS ("ABB Turkey"). The six subsidiaries developed various schemes to pay secret kickbacks to Iraq in order to obtain contracts. The kickbacks were characterized as after sales service fees but in reality they were nothing more than bribes paid to the Iraqi regime.

38. Kickbacks of approximately $810,793 were paid in connection with the subsidiaries' sales of goods on twenty-seven contracts with promises to pay additional kickbacks of $239,501 on three other contracts. The total revenues on the contracts were approximately $13,577,727 and profits were $3,801,367. ABB improperly disguised the ASSFs on its books and records by mischaracterizing them as legitimate after sales services, consultation costs or commissions.

### ABB Jordan

39. ABB designated ABB Jordan as the entity with authorization to facilitate sales to Iraq for ABB subsidiaries. ABB Jordan paid kickbacks to Iraq on various ABB

Jordan contracts, as well as on contracts awarded to other ABB subsidiaries. In particular, from approximately August 2001 to June 2002, ABB Jordan paid illicit ASSFs of approximately $309,484 in connection with eleven ABB Jordan contracts for the sale of switchyard equipment to the Iraqi Electricity Commission and the Commission's regional company, the Baghdad Mayoralty, all government entities. ABB Jordan also agreed to pay a 10% ASSF on one other Oil for Food contract but the U.N. had ABB amend the contract to remove the ASSF amount before it was paid.

40. In early 2001 the General Manager of ABB's Baghdad office began receiving repeated verbal and written requests from officials within the Iraqi government for the payment of 10% fees on all Oil for Food contracts. In March 2001, the Baghdad General Manager and an ABB Jordan employee traveled to Zurich, Switzerland, to meet with ABB's Group Export Control ("GEC") about the payment demands. The GEC was the ABB group responsible for monitoring all exports to Iraq. ABB employees who traveled to Zurich in 2001 alleged that GEC authorized them to pay the kickbacks. GEC personnel, however, alleged that no such approvals were provided. After the GEC approvals were allegedly obtained, the ABB Jordan employees inflated their Oil for Food contract bids by approximately 10% to cover the cost of the kickbacks they intended to pay to Iraq. The artificially inflated contracts were then provided to the UN for approval. At no time did ABB notify the UN that it was secretly paying ASSFs to Iraq. Proof of the payments was found in certain ABB documents. For example, ABB Jordan's internal project costs documentation referred to the kickbacks as legitimate costs for "after sales services," "consultation costs" or "training." ABB Jordan used bank guarantees to make the first two ASSF payments to the Baghdad Mayoralty.

41.     The subsequent nine ASSFs were paid in cash and hand delivered by the General Manager of ABB Jordan to a designated official at the Iraqi Electricity Commission. ABB Jordan received written receipts of the kickbacks paid in cash to the designated official. ABB Jordan's profits from all twelve contracts, including the contract where a kickback was promised but not paid, were $970,276.

### ABB France

42.     From approximately 2000 to 2002, ABB France entered into six contracts for the sale of electrical accessories and equipment to the Iraqi Electricity Commission and the Ministry of Industry and Minerals in which kickbacks of approximately $244,844 were paid. ABB France used French Agent, a French company headquartered in Paris, as its local agent in Iraq to facilitate each of the sales. The French Agent submitted tender offers on behalf of ABB France and negotiated contract terms with the Iraqi customers. The use of the French Agent violated ABB's internal policies and procedures, which required all contacts with Iraq to be handled by ABB Jordan. The Jordan office was the only ABB subsidiary authorized to deal with customers in Iraq, and agents could not be used unless specifically authorized by ABB Jordan. ABB's company policy also required all contracts with Iraq to be reviewed and approved by GEC in Zurich, Switzerland. Despite this, there is no indication that ABB France ever approached GEC for approval of any of its Oil for Food contracts. In addition, ABB could not locate any written agency agreement with the French Agent, and it could not substantiate the performance of any legitimate business services by the French Agent. Records show that ABB France paid the French agent commissions of anywhere from 2.5% to 17% on the Oil for Food contracts, with an average commission of 9%.

43.     An April 2002 receipt shows a payment of $10,000 by ABB France to the Iraqi Commission of Electricity in connection with a 2001 OFFP contract. In connection with another 2000 OFFP contract, a July 2000 handwritten internal document references a payment of 20,000 euros, and described the payment as a "10% commission for the Iraqi government." The document was likely prepared by ABB's former area sales manager for ABB France.

44.     From approximately March 2000 to at least February 21, 2002, ABB France used the French Agent as a distributor to facilitate five additional contract sales to Iraq. The French Agent purchased goods directly from ABB France for its own account. The French Agent, in turn, then sold ABB France's products to Iraq and submitted its own inflated contracts to the U.N. Thus, ABB France was no longer the party named on the inflated contracts to the U.N. As a result, ABB was able to move its goods into Iraq, but keep itself distanced from any involvement in the ASSF scheme. The French Agent paid kickbacks of approximately $92,805 on the contracts. ABB France paid the French Agent fees through the use of performance bonds and bid bonds on the contracts that equaled approximately 10% of the contract value. The French agent used these additional payments from ABB France to pay kickbacks to Iraq. Altogether, ABB France obtained profits of $768,584 on the eleven contracts.

### ABB Austria

45.     ABB Jordan also facilitated kickbacks paid on behalf of ABB Austria. From approximately 2000 to 2002, ABB Austria entered into three contracts for the sale of electronic and switchyard equipment to the Iraqi Electricity Commission in which kickbacks of $3,865 were paid. ABB Austria submitted the contract bids to Iraq on

15

behalf of ABB Utility Automation GmBH, ("DEUTA"), a German subsidiary of ABB Ltd. DEUTA prepared the bids for ABB Austria, which then forwarded them to ABB Jordan. The ABB Jordan employee responsible for submitting the DEUTA bids to Iraq acknowledged that payment of a 10% surcharge was the prevalent practice in the market and that ABB was told that if it did not pay kickbacks it would not get any business from Iraq. The employee acknowledged that a 10% increase between the bid and purchase order price on one ABB Austria contract could have related to an ASSF fee to Iraq. ABB Austria's profits on the three contracts were $8,386.

### ABB Turkey

46.     Similar to Austria, ABB Jordan facilitated kickbacks paid on behalf of ABB Turkey. From approximately 2001 to 2002, ABB Turkey entered into two contracts with the Ministry of Oil Economics and Finance Department ("MOEFD") on which kickbacks of $159,795 were paid. After ABB Turkey submitted bids for contracts, Iraqi officials would demand that kickbacks be added to the price of the contracts. ABB Turkey was notified that it would not receive any contracts if it did not agree to the kickback scheme. The secretly inflated contract prices were submitted to the UN for approval. There are two April 2001 side agreements, signed by ABB Turkey, to pay kickbacks to the Iraqi North Oil Company in connection with the MOEFD contracts described above. There are additional side agreements signed by ABB Turkey, in which ABB Turkey authorized, but did not pay, $239,501 in improper ASSF payments in connection with three additional contracts.[2] Despite the fact that ABB Turkey had entered into written side agreements to pay the kickbacks, ABB Turkey sent a letter to the

---

[2]     Because the sale was not completed and the ASSF was not paid by the time of the U.S. invasion of Iraq in March 2003, the UN required that ABB Turkey amend its contract price to remove the ASSF.

Volcker Committee on September 1, 2005, indicating that "[w]e have gone through our records and reviewed our files, and our findings show no unauthorized payments to the Iraqi government under the scope of this programme." ABB Turkey's profits from all five contracts were $2,052,121.

## IV. ABB Committed Anti-Bribery, Internal Controls, and Books and Records Violations

47. ABB, through its U.S. subsidiary, made millions of dollars in illicit payments and promised payments, either directly or indirectly, to Mexican government officials to obtain or retain business. ABB made use of U.S. mails and interstate commerce to carry out the scheme.

48. In connection with all of the illicit payments in Mexico and Iraq, and the payments that were part of the embezzlement scheme, ABB failed to make and keep accurate books, records and accounts. The bribes and other illicit payments were improperly recorded as legitimate commissions or other expenses in ABB's books and records.

49. Moreover, as evidenced by the extent and duration of the illicit payments to foreign officials, the large number of ABB subsidiaries involved in these bribery and kickback schemes, ABB's knowledge from the prior Commission action of illicit payments by other ABB subsidiaries, the improper recording of millions of dollars of illicit payments in ABB's books and records, ABB's failure to detect these irregularities, and ABB's failure to conduct sufficient due diligence on local agents and others, ABB failed to devise and maintain an effective system of internal controls to prevent or detect these anti-bribery and books and records violations.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Anti-Bribery)
### [Violations of Exchange Act Section 30A]

50. Paragraphs 1 through 49 are re-alleged and incorporated by reference.

51. As described above, ABB, through its agents and subsidiaries, corruptly offered, promised to pay, or authorized illicit payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their official duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist ABB in obtaining or retaining business.

52. By reason of the foregoing, ABB violated, and unless enjoined will continue to violate, the anti-bribery provisions of Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

### SECOND CLAIM

### (Books and Records)
### [Violations of Exchange Act Section 13(b)(2)(A)]

53. Paragraphs 1 through 49 are re-alleged and incorporated by reference.

54. As described above, ABB, through its officers, agents and subsidiaries, failed to accurately and fairly reflect its transactions and dispositions of its assets by inaccurately recording numerous illicit payments as legitimate business expenses.

55. By reason of the foregoing, ABB violated Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## THIRD CLAIM

### (Internal Controls)
### [Violations of Exchange Act Section 13(b)(2)(B)]

56. Paragraphs 1 through 49 are re-alleged and incorporated by reference.

57. As described above, ABB, through its officers, agents and subsidiaries, failed to detect and prevent the illicit payments revealing a lack of effective internal controls sufficient to provide reasonable assurance that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

58. By reason of the foregoing, ABB violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

(a) permanently restraining and enjoining ABB from violating Exchange Act Sections 30A, 13(b)(2)(A), and 13(b)(2)(B);

(b) ordering ABB to disgorge ill-gotten gains together with prejudgment interest thereon received in connection with the conduct alleged in this Complaint;

(c) ordering ABB to pay a civil penalty pursuant to Exchange Act Sections 21(d)(3) and 32(c) [15 U.S.C. §§ 78u(d)(3) and 78ff(c)]; and

(d)   granting such other and further relief as is just and appropriate.

          Respectfully submitted,

_Cheryl Braham_
Cheryl J. Scarboro (DC Bar No. 422175)
Scott W. Friestad
Tracy L. Price
Brian O. Quinn
Denise Hansberry
Tonia J. Tornatore
Securities and Exchange Commission
100 F St., NE
Washington, DC 20549-5030
Tele: 202-551-4403
Fax:  202-772-9286

Dated: _September 29_, 2010